31 N.J. Super. 329 (1954)
106 A.2d 361
STERLING H. ANDERS, ET AL., PLAINTIFFS,
v.
GREENLANDS CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 25, 1954.
*331 Messrs. Katzenbach & Salvatore (Mr. Frank S. Katzenbach III appearing), attorneys for plaintiffs.
Messrs. McCarter, English & Studer (Mr. Nicholas Conover English appearing), attorneys for defendant Greenlands Corporation.
Messrs. Smith, Stratton & Wise (Mr. Hugh D. Wise appearing), attorneys for defendants Edmund Cook and Company and Edmund D. Cook.
Messrs. French & Cook (Mr. Bruce H. French appearing), attorneys for defendants Richard Savage and Herbert J. Kendall, partners, trading as Savage & Kendall.
GOLDMANN, J.S.C.
Plaintiffs bring this action for an injunction to compel compliance with a restrictive covenant, *332 numbered 2 and set out below, contained in their deeds as well as in those of other owners of lots in the Greenlands Corporation tract located in Princeton Township, New Jersey. They seek restraint pendente lite. Defendants move for summary judgment dismissing the action.
Nine of the plaintiffs obtained their deeds directly from Greenlands, and six took by mesne conveyances. The covenants are ten in number and are common to all deeds in the Greenlands tract. The covenant on which plaintiffs base their action provides as follows:
"2. No building shall be erected, placed or altered on any plot until the exterior design and location thereof shall be approved in writing by the Greenlands Corporation, their successors or assigns; provided, however, that if the Greenlands Corporation, their successors or assigns, fails to approve or disapprove such design and location within thirty days after such plans have been submitted to it, or if no suit to enjoin the erection of such building or the making of such alterations has been commenced prior to the completion thereof, such approval shall not be required."
They also rely on the covenant, variously numbered 8 or 9, which reads:
"The restrictive covenants set forth herein are imposed pursuant to a general plan of improvement."
The remaining covenants provide that all lots on the Greenlands tract shall be residential and no structure shall be erected or altered other than dwellings and their customary out-buildings, to be located on a lot of minimum 7,500 square foot size, no building to exceed 2 1/2 stories or 40 feet in height; no building shall be located nearer than ten feet to any lot line, and its total area, including overhangs and covered porches, shall not exceed 40% of the lot area; no fence or wall shall exceed four feet if built within 50 feet of the lot line, or six feet if built beyond 50 feet; only buildings that have been approved under covenant No. 2 shall be used as a residence; no building materials, refuse, junk, machinery, trucks, or automobiles exceeding one passenger *333 car shall be kept or stored on any lot at any time, other than during the course of construction or alteration, unless stored in the dwelling approved under covenant No. 2; covenants are to run with the land until January 1, 1965, when they are to be extended automatically for ten years unless a majority of the then front-foot owners of lots agree that they be changed; and no part of the premises shall ever be used, occupied by or leased to any person not a member of the Caucasian race, domestic servants excepted. Conveyances after February 15, 1950 recite that this last restriction, included in prior deeds and imposed "as part of a general plan of improvement" of the Greenlands tract, "is included herein to the extent the same may be in any way presently valid and legally enforceable." (As to the enforceability of such covenants, see Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441 (1948); Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948)).
Defendant Edmund Cook and Company is engaged in the insurance and real estate brokerage business in and about Princeton, N.J. Defendant Edmund C. Cook is its president and, it is claimed, its chief stockholder. He is also the vice-president of Greenlands, the record holder of 25% of its common stock, and controls 75% of all such stock. He owns and controls less than half of the preferred stock. Defendants Savage and Kendall, trading as Savage & Kendall, a partnership, are about to purchase all the stock of Greenlands Corporation and plan to build dwellings on the 34 lots remaining in the original Greenlands tract. Traversing the tract are three streets: Rollingmead, which is completely developed, or nearly so, and Deer Path and Clover Lane, more recently opened up and dedicated as public ways, and along which the 34 lots are located.
Plaintiffs allege that during the period Greenlands and the Cook company developed and sold lots from the tract in question, defendants, through their officers and agents, represented to plaintiffs that the restrictions to be included in *334 their several deeds were part of a general plan of improvement of the entire tract; that such representations were made to induce plaintiffs to purchase their properties in an area that would have additional advantages by reason of said restrictions, and that plaintiffs relied on these representations in purchasing their properties. More particularly, plaintiffs claim that they were in great degree attracted by and induced to make their purchases in reliance on covenant No. 2 set out above; that Greenlands and the Cook Company, through their officers and agents, made definite representations to purchasers that Greenlands would not approve plans "unless in consonance with the character of the architecture generally prevailing and further, would not approve the placing of houses of similar design in propinquity to another house of substantially the same design;" that until the present time the intent and purpose of the plan of development, "viz, to adhere to a general, over-all plan of individualized American architecture," has been faithfully pursued. Plaintiffs represent that Greenlands and the Cook company propose to have Savage & Kendall develop the remainder of the Greenlands tract in a manner "totally dissonant with the general plan of development" on which plaintiffs relied in buying their present homes. They charge that the several defendants plan to build some 30 houses "of identical floor plan and similar exterior varying only in minor detail and trim," and that Greenlands, Cook and the Cook company have negotiated with Savage & Kendall to develop the tract in this manner  in derogation of plaintiffs' rights  either by outright sale, piecemeal sale of lots, or sale of the entire stock of Greenlands to Savage & Kendall. Plaintiffs claim that their properties will be greatly depreciated in value if defendants' present plan of developing the remainder of the tract is carried out. They demand judgment restraining defendants from (a) building any structure "not in character with the neighborhood, viz., houses which are not of individualized American architecture," the plans for which have been approved by Greenlands, and (b) violating *335 any provision of the deeds, covenants, and agreements, "either express or implied," between plaintiffs and defendants.
The affidavit of plaintiff John E. Dobbin, attached to the complaint, alleges he received his deed from Greenlands on March 1, 1951; that his dealings were with Mrs. Marjorie Kerr (vice-president in charge of the real estate brokerage department of Edmund Cook and Company) who explained that the purpose of the Greenlands development was to build a few houses at a time, the insistence being on houses "differently styled and architected to the tastes and needs of the individual home owner, while preserving an over-all American type architecture in keeping with the character of the homes already erected;" that his deed would contain the same restrictive covenants as prior deeds, and that plans would first have to be approved by Greenlands. Such covenants were included in his deed, and Mr. Cook examined and approved his plans. The affidavit further alleges that early in 1953 Dobbins learned that Greenlands planned to develop the rest of the tract by building some 30 houses, all of the same type and design; that a model house was erected, whereupon the neighbors objected to Mr. Cook and asked him to abandon the project; that Cook wrote him acknowledging the obligation of Greenlands to preserve the original character of the development, and that eventually the Cook firm and Greenlands abandoned the project.
The affidavit of plaintiff John W. Kauffman is to similar effect. He acquired his property in August 1950, his deed containing the restrictions in question, as had been promised. He alleges that before completing the purchase both Cook and Mrs. Kerr assured him that Greenlands would develop the tract "in a manner which would be in keeping with the situation in effect at the time we purchased our property," and that Greenlands would examine plans for homes to be built and would disapprove any "not in keeping with the general tenor of the neighborhood." A similar affidavit is submitted by plaintiff Deane Montgomery, who bought his property in July 1948. He states that he purchased on the *336 basis of representations made by Greenlands and its agents (not named) that the tract would be developed "in keeping with the conditions in existence at the time when we made our purchase." Affiant Harold M. Weeks, who bought his property in 1954, states merely that he and his wife "understood" that the deed restrictions would help maintain the character of the neighborhood, and that it was "our belief," from observation of the area and conversations with various persons, that the rest of the tract would be developed along similar lines.
The allegations of the complaint and of the several affidavits in support of the motion for an interlocutory injunction are fully and specifically countered by those submitted on behalf of defendants. These reveal that defendant Cook, individually, has never owned and does not intend to acquire any of the Greenlands tract, and has never built nor does he intend to build any structure in that area. As real estate broker he has sold lots in the tract; he advised prospective purchasers of the deed restrictions and assured them they could be contained in future deeds; he has no intention of encouraging anyone to violate these covenants; and he specifically denies representing that homes to be built on the tract would be "individualized American architecture" or "over-all American type architecture." The original homes on Rollingmead were "American Homes," a trade-name for a standardized type of prefabricated home. The Greenlands stock is about to be sold to Savage & Kendall, and after the sale is consummated Cook will have no financial interest in or connection with the development that will follow.
As for Edmund Cook and Company, it owns no stock in Greenlands Corporation, owns no land in the tract, and has no intention of building any structure there. In selling lots or houses in the Greenlands development it has advised customers of the deed restrictions but made no representations inconsistent with them or extending them. The firm has no connection with the proposed development of the remainder of the tract by Savage & Kendall, nor has it any brokerage *337 arrangement with them as to future sales. As for the letters referred to in the Dobbin affidavit, relating to a proposed development early in 1953, they were written by Mr. Cook to correct misinformation as to the plans of the Pynebrook Corporation, the developer; they were not intended as any representation, covenant, or additional restriction with respect to the future development of the tract. (The letters were written two years after Dobbin purchased his lot, three years after Kauffman bought his house, and five years after Montgomery purchased his house.)
Defendants' affidavits further reveal that the Greenlands Corporation now owns about 18 acres of its original tract; since 1950 its policy has been to sell lots and not build; all deeds carry the mentioned restrictive covenants and the corporation has no present or future intention of violating them or permitting anyone else to do so. These covenants constitute the only restrictive elements in the plan of development. The restriction requiring the prior approval of the exterior design of any house to be built was intended for the protection of the company and its grantees, in order to prevent, among other things, the exercise of individual taste to the detriment of the area in general. Greenlands has no contract with Savage & Kendall, or anyone else, to develop the remaining 18 acres; no one has an option to buy any of the lands; the only proposal is the pending sale of all the Greenlands stock to Savage & Kendall. Like Cook, the vice-president of Greenlands, its president, Bowers, has no knowledge of any covenant or agreement, implied or otherwise, between plaintiffs and the company, other than the covenants in the deeds.
Savage & Kendall declare that after they acquire the Greenlands stock they will include the same covenants in their deeds as appear in plaintiffs', and every house built will conform to these restrictions. These houses will be priced at about $20,000. They will be identical as to basic floor plan and contain 1,600 square feet of living space. There will be eight variations in exterior design and no two like *338 houses will be placed next to each other. The representation is that the houses will "vary as to materials, treatment of exterior materials, location and number of windows, size and location of car ports, location of driveways, juxtaposition on lots, set-back and landscaping. While generally similar in character and detail, the roof lines will also be varied." The houses will be of modern design, "conventionally constructed rather than prefabricated."
The court has examined the proposed plan of development, drawings of the two basic front elevations, and blueprints of what Savage & Kendall call the eight variations in exterior design. The proposed houses are essentially alike. They are a ranch-type home, with car port separating the living space from a storage space. The variations are indeed slight  an unbroken line of slightly pitched roof as against a broken line; an extra window in the front elevation; allover use of clapboard in one style, with a clerestory window above the entrance in another; different placement on the several lots, with necessarily different driveways; differently painted exteriors. These are the houses Savage & Kendall propose to build on Deer Path and Clover Lane. Contrast the variety of architectural treatment to be found in the houses on Rollingmead, examined by the court with the consent of counsel.
The question here is not one of plaintiffs' personal tastes and preferences, or of aesthetics, but of whether on the facts and the law plaintiffs' action can survive defendants' motion for summary judgment.
Preliminarily, it is entirely clear that plaintiffs are not entitled to interlocutory restraint. Not only is plaintiffs' case doubtful in law, but it is equally doubtful on the facts, as a reading of the affidavits will show. To justify the issuance of an interlocutory injunction, plaintiffs' case must exhibit a right free from doubt or reasonable dispute. Allman v. United Brotherhood of Carpenters, etc., 79 N.J. Eq. 150, 155 (Ch. 1911), affirmed 79 N.J. Eq. 641 (E. & A. 1912). Where the right of a plaintiff to relief by enforcement *339 of an alleged restrictive covenant is doubtful, to doubt is to deny. Such a covenant must not be vague or uncertain; plaintiff's right to insist upon it and to invoke equity's injunctive power must be clear and satisfactory. Fortesque v. Carroll, 76 N.J. Eq. 583, 585-586 (E. & A. 1910). The court in Howland v. Andrus, 81 N.J. Eq. 175, 181 (E. & A. 1913), held:
"* * * every doubt and ambiguity in the language of a covenant restricting an owner's use of his property must be resolved in favor of the owner's right.
Courts of equity do not aid one man to restrict another in the uses to which he may lawfully put his property unless the right to such aid is clear."
Houston Petroleum Co. v. Automotive Products Credit Ass'n., 9 N.J. 122, 133 (1952).
Every material fact upon which plaintiffs rely is denied by defendants, fully and explicitly, under oath. A preliminary injunction may not issue in such a case. Ferraiuolo v. Manno, 1 N.J. 105, 108 (1948). Such has long been the established law of this State. Citizens Coach Co. v. Camden Horse R.R. Co., 29 N.J. Eq. 299, 306 (E. & A. 1878).
Plaintiffs do not allege or show that the threatened injury is of an irreparable character  a prerequisite to the issuance of a preliminary injunction. They claim, merely, an anticipated depreciation in property value. A preliminary injunction will never be ordered unless from pressure of an urgent necessity; the damage threatened must, from an equitable view, be of an irreparable nature. It is unnecessary at this late date to trace the long line of cases following this principle enunciated in the Citizens Coach case (at p. 303). Incidentally, the allegation of depreciation found in the complaint and supporting affidavits stands alone, without a showing of fact or basis therefor. This, plus the failure to allege irreparable damage, makes it clear that plaintiffs have not exhibited a cause entitling them to the extraordinary equitable relief of a preliminary injunction.
*340 We need not consider defendants' argument that the relief sought by plaintiffs in their demand for judgment as well as in their motion for restraint pending final hearing, is so vague that were an injunction granted in the terms they seek, it would not comply with R.R. 4:67-5, which requires that every order granting an injunction be specific in terms and describe with reasonable detail the act or acts to be restrained.
We turn to the dispositive question of whether summary judgment should go in defendants' favor. We are not concerned with the problem of whether a neighborhood scheme is here presented. Greenlands readily admits that it adopted a general scheme for the development of the tract it purchased in 1940. This plan was embodied in the restrictive covenants included in every deed issued by the corporation, and centers upon the provisions of covenant No. 2 which provides that no structure could be erected, placed or altered "until the exterior design and location thereof shall be approved in writing by the Greenlands Corporation, their successors and assigns; * * *."
There is no complaint of actual violation of the written covenants. Defendants assert they will live up to the letter of the restrictions, but their assurances do not allay the doubts and fears of the residents.
Plaintiffs spell out their right to relief by conjoining the following elements: (a) the restrictive covenant relating to grantor's prior approval of exterior design and location, (b) the provision in the deeds (covenant No. 8 or 9) that the restrictions are imposed pursuant to a "general plan of improvement," (c) defendants' oral representations at the time of the respective purchases, and (d) the manner in which the tract has actually been developed through the years, so as to create a small community of homes of varying architectural styles.
Plaintiffs first argue that in construing a written contract great weight will be given to the practical interpretation placed upon it by the parties, as exhibited by their conduct *341 in respect to it. The authorities cited in support relate to the interpretation of contracts. Our concern here is with the law relating to restrictive covenants  quite a different matter.
It is next contended that since the meaning of covenant No. 8 (9), which speaks of "a general plan of improvement," is not entirely clear, one may consider the declarations of the parties in interpreting the written instrument. We consider the meaning of that phrase entirely clear: the restrictive covenants as a group compose the general plan of improvement  minimum lot area, set-back and side-line requirements, maximum building height and area, fence and wall restrictions, the residential nature of the development, and all the rest.
We have already referred to the deeply rooted principle that equity will not aid one man to restrict another in the uses to which he may put his land unless the right to restrict is made manifest and clear in the restrictive covenant. Underwood v. Herman & Co., 82 N.J. Eq. 353, 355 (E. & A. 1913); Houston Petroleum Co. v. Automotive Products Credit Ass'n., 9 N.J. 122, 133 (1952). It has repeatedly been laid down that restrictions upon the use of lands are not looked upon with favor; such restrictions are always to be construed strictly, and ambiguities and uncertainties are to be resolved in favor of the owner's unrestricted use of the land. Paff v. Margerum, 103 N.J. Eq. 74, 76 (E. & A. 1928); Majeski v. Stuyvesant Homes, Inc., 140 N.J. Eq. 460, 462 (Ch. 1947).
The restriction which plaintiff would erect out of the four components mentioned above is that the development would "adhere to a general over-all plan of individualized American architecture"  future homes would be in keeping with those already in existence. Such a restriction is nowhere to be found among the covenants common to all the deeds. We are asked to import it into the neighborhood scheme expressly framed by these ten covenants by implying it from the alleged representations of the defendants and the existing quality of the neighborhood.
*342 There was, of course, no definite and established architectural pattern when the first purchasers bought lots in the Greenlands tract. There was no so-called "over-all plan of individualized American architecture." As a matter of fact, the first homes were standardized, prefabricated dwellings, spotted about the development. The street known as Rollingmead could, within the strict letter of the provisions of covenants Nos. 2 and 8, have very well developed into a residential area exhibiting markedly limited structural variety.
Neighborhood schemes are the product of covenant. Scull v. Eilenberg, 94 N.J. Eq. 759, 771 (E. & A. 1923). They arise when there is a general plan made public by the owner of the tract for the development of his property, "to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof; and the covenants are actually inserted in all deeds for lots sold in pursuance of the plant * * *." DeGray v. Monmouth Beach Club House Co., 50 N.J. Eq. 329, 340 (Ch. 1892), affirmed 67 N.J. Eq. 731 (E. & A. 1904).
The trend of authority is against any extension of the doctrine of implied covenants. What plaintiffs seek here is to add to the existing covenants a restriction based on alleged parol representations. This would violate the statute of frauds, R.S. 25:1-1. Frisch v. Rutgers Village, 8 N.J. Super. 392, 402 (Ch. Div. 1950). Parol evidence would be admissible if there were proof of actual fraud. But fraud is not charged or proved, and so defendants are not estopped from interposing the defense which the statute accords them. Radey v. Parr, 108 N.J. Eq. 27, 31 et seq. (Ch. 1931), approved in principle in Droutman v. E.M. & L. Garage, Inc., 129 N.J. Eq. 545, 547 (E. & A. 1941).
The motion for summary judgment is granted.